**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STERLING ASSET MANAGEMENT, LLC. | : | CIVIL ACTION |
| f/k/a VALLEY FORGE ADVISORS, LLC. | : | |
| | : | |
| vs. | : | |
| | : | |
| VTL ASSOCIATES, LLC | : | NO. 10-07102 |
| and VINCENT T. LOWRY | : | |
| | : | |
| vs. | : | |
| | : | |
| INDEX LICENSING, LLC., | : | |
| BRIAN McELWEE, and | : | |
| RICHARD IRELAND | : | |

**MEMORANDUM AND ORDER**

JOYNER, C.J.                                        August 17, 2011

        This action is presently before this Court for adjudication
of the Plaintiff/Counterclaim Defendant's Motion to Dismiss the
Defendant/Counterclaim Plaintiffs' First Amended Counterclaim for
Failure to State a Claim Upon Which Relief Can Be Granted (Docket
No. 15).  For the reasons which follow, the motion shall be
denied.

**Statement of Pertinent Facts**

        In 2005-2006, Vincent T. Lowry ("Lowry"), the Chief
Executive Officer of Defendant/Counterclaim Plaintiff VTL
Associates, LLC ("VTL"), developed a unique Revenue-Weighted
investment methodology.  By a letter dated March 21, 2007

1

("Letter Agreement") (Exhibit C), VTL entered into an agreement with Valley Forge Advisors, LLC, Sterling Asset Management's ("Sterling") predecessor-in-interest, Brian McElwee ("McElwee"), and Richard Ireland ("Ireland") "to promote, market, and develop" its Revenue-Weighted Program.  In exchange, VTL agreed to "assign its inventions, patent applications, and patents developed by Lowry to Advanced Indexing Methodologies, LLC ("AIM").  At that time, the members of AIM were Lowry, Brian McElwee, and Richard Ireland.  McElwee and Ireland were also the original principals of Sterling's predecessor-in-interest.

In July of 2008, Sterling and VTL entered into the First Amended Subadvisory and Fund Administration Agreement ("VFA Agreement") (Exhibit A), which, according to Sterling, required it to provide back office support, as well as numerous investment advisory services to VTL and its clients."  However, according to VTL, Sterling's duties under the VFA Agreement were "essentially administrative", and did not include advising clients because Sterling was a "subadvisor", not an investment advisor.  Sterling could utilize the Revenue-Weighted indexes solely as a subadvisor for clients to whom VTL served as an investment advisor.  Pursuant to the VFA Agreement as well as prior versions of it, VTL referred several clients to Sterling and its predecessors, including City Trusts.

Also, in July of 2008 the parties and others entered into a

series of agreements relating to the licensing and use of the
Revenue-Weighted methodology.  Significant to this Motion to
Dismiss is the License Agreement to Use Indexes ("License
Agreement") (Exhibit C), which granted Sterling the right to use
the Revenue-Weighted Methodology.  The License Agreement
contained a non-competition clause, which prohibited the parties
from

> transferring, moving, or attempting to transfer or move any
> assets from any program created by or using the AIM
> Methodology or otherwise promoted using any AIM trademarks
> to any other investment program not using the AIM
> Methodology and not using the AIM trademark.

Also at issue in this Motion to Dismiss is the Intentions and
Assurances Agreement (Exhibit F) concluded between AIM, VTL, and
Index Licensing, LLC. ("IL") in July 2008.  The members of IL at
that time were McElwee and Ireland.  The stated purpose of the
Intentions and Assurance Agreement was to "jointly promote,
market, and develop the Revenue-Weighted investment methodology.
Last, but not least, the Letter, which, according to VTL, has the
same purpose as the Intentions and Assurances Agreement, is at
issue in this Motion to Dismiss.

In Count I of their Counterclaim, Lowry and VTL allege that
in April 2010, Sterling breached the non-competition clause of
the License Agreement by removing City Trusts' assets from the
Revenue-Weighted Program to a non-AIM Methodology investment
program, and that Sterling breached the clause by recommending to

3

City Trusts that it transfer its assets from the Revenue-Weighted Program.

Counterclaim Defendants, Sterling, IL, McElwee, and Ireland, moved to dismiss Count I for failure to state a claim because, they assert, Counterclaim Plaintiffs failed to factually support the allegation that Sterling did remove City Trusts' assets from the Revenue-Weighted Program.  Also, Counterclaim Defendants assert that "recommending" to a client that it transfer its assets to a different investment program is not within the scope of the non-competition clause, and thus is not a breach of it. Furthermore, they assert that this Court cannot interpret the non-competition clause in this manner because it "would come dangerously close to impinging upon [Sterling's] fiduciary obligations" to advise its clients.

However, according to Counterclaim Plaintiffs, in this context, such a recommendation did constitute an attempt to transfer, and thus it was a breach of the non-competition clause. Also, Counterclaim Plaintiffs assert that Sterling owed no such duty to give investment advice to City Trusts because Sterling was the subadvisor, while VTL was the one charged with such a duty because it was City Trusts' investment advisor.

## Discussion

When considering a motion to dismiss pursuant to Rule 12(b)(6), first a District Court must separate the factual and

legal elements of the claim, and accept all of the well-pleaded facts as true and view them in the light most favorable to the plaintiff, but may reject any of the legal conclusions. <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009), and <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211-212 (3d Cir.2009). Second, the court must determine whether the facts alleged demonstrate that the plaintiff has a "plausible claim for relief." <u>Fowler</u>, 578 F.3d at 212. At the pleading stage, a plaintiff is not required to go into particulars, but "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." <u>Id.</u> at 213 (citations omitted). Also, the Third Circuit has stated that the heightened pleading standards of <u>Twombly</u> and <u>Iqbal</u> apply to cross-claims. <u>Travelers Indem. Co. v. Dammann & Co.</u>, 594 F.3d 238, 256 n.13 (3d Cir. 2010). <u>See also</u>, <u>Southeastern Transp. Auth. v. AECOM USA, Inc.</u>, 2010 WL 4703533 (E.D.Pa. Nov. 19, 2010) ("the pleading standards set forth in <u>Twombly</u> and <u>Iqbal</u> apply with equal force to cross-claims, counterclaims, and third-party complaints").

Here, Counterclaim Plaintiffs have stated sufficient facts to demonstrate that they have a "plausible claim for relief" for breach of contract against Sterling, and thus Counterclaim Defendants' Motion to Dismiss is denied. While Counterclaim Defendants assert that Counterclaim Plaintiffs have not alleged factual support for their allegation that Sterling actually

transferred funds from the Revenue-Weighted Program, this allegation is a fact as pleaded by VTL and Lowry, not a legal conclusion.  Counterclaim Plaintiffs provided this fact in support of their legal conclusion that Sterling breached the non-competition clause.  Their Counterclaim alleges that "in April of 2010 Sterling did remove City Trust[s'] assets from a program using AIM Methodology to an investment program not using the AIM Methodology and not using the AIM trademarks."  It is not a "thread-bare, conclusory assertion" as Counterclaim Defendants assert.  <u>Iqbal</u> 129 S. Ct. at 1951.  It provides Sterling fair notice of the conduct that it must defend.  Count I provides a date range in which the conduct occurred, a description of what conduct violated the agreement, and a description of the assets that were removed.

Counterclaim Plaintiffs' second allegation in Count I - that Sterling breached the non-competition clause by recommending that City Trusts transfer its assets out of the Revenue-Weighted Program - also plausibly states a claim for relief.  While the parties dispute whether "recommending" constitutes an "attempt to transfer", this Court finds that "attempt" in this context plausibly encompasses "recommending."

Under Pennsylvania law[1], it is a well-settled principle that

_____

[1] As stated in Paragraph 14 of the License Agreement, Pennsylvania law governs.

when a court has to interpret a contract, "the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982) (citations omitted).  However, "some of the surrounding circumstances always must be known before the meaning of the words can be plain and clear." Id. "Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the language they employed." Murphy v. Duquesne Univ. Of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001) (citation omitted).

While Sterling asserts that the use of the word "attempt" demonstrates that the parties only meant to prohibit inchoate transfers of assets out of the program; the use of the word "attempt", rather than "inchoate", and the context seem to suggest that the parties meant to prohibit more competitive conduct than just merely inchoate transfers.

"Attempt" is "[t]he act or an instance of making an effort to accomplish something, esp[cially] without success." Black's Law Dictionary 146 (9th ed. 2009).  On the other hand, "inchoate" means "[p]artially completed or imperfectly formed; just begun." Id. at 830.  While these two words are similar in meaning, they are not identical; and the parties' use of one and not the other

7

should be respected. See, e.g., Murphy, 777 A.2d at 430.
"Attempt" is broader and encompasses more than just uncompleted
acts; it includes steps that are taken in an effort to accomplish
a particular result.  Thus, it is plausible that a recommendation
to transfer assets might constitute an attempt to transfer assets
if the recommendation was made in an effort to accomplish the
goal of actually transferring the assets out of the Revenue-
Weighted Program, which Counterclaim Plaintiffs allege did occur.

   This interpretation is buttressed by the context.  It
appears that most, if not all, of such asset transfers are done
electronically.  Thus, absent a computer glitch, power outage, or
another event of that nature, it is very unlikely that a transfer
would not be successful.  Surely, the parties meant to discourage
more competitive conduct than this.  Such a recommendation to
transfer assets to another investment program appears to be the
sort of competitive conduct the non-competition clause was
intended to prohibit.

   However, Counterclaim Defendants assert that this
interpretation is not possible because it "would come close to
impinging upon" Sterling's statutorily-imposed fiduciary
obligations[2] to advise its clients in their best interest.  On

---

   [2]  Pursuant to Investment Advisers Act of 1940, § 206, 15 U.S.C.A. §
80b-6, financial advisors have a fiduciary duty to act at all times in the
best interest of their clients.  Sec. And Exch. Comm'n v. Tambone, 550 F.3d
106, 110 (1st Cir. 2008), aff'd in part rev'd in part on other grounds, 597
F.3d 436 (1sr Cir. 2010) (en banc).

the other hand, according to Counterclaim Plaintiffs, Sterling
was not in a position to pose such recommendations to clients,
like City Trusts, because Sterling was not the investment
advisor, but rather the subadvisor, charged with mostly
administrative duties, not advisory duties to clients.  At this
time, it is not clear exactly what the roles of the parties were
and which duties, if any, Sterling owed to City Trusts.  If
Counterclaim Defendants' version of events proves correct, *i.e.*,
Sterling was obligated to act in City Trusts' best interest, and
if they demonstrate that interpreting the non-competition clause
in a way that actually impinges upon that duty, rather than
merely coming close to doing so; then, as Counterclaim Defendants
argue, this interpretation is not possible.  <u>American Ass'n of
Meat Processors v. Casualty Reciprocal Exch.</u>, 588 A.2d 491, 495
(1991) ("[T]he general rule [is] that an agreement which violates
a provision of a statute, or which cannot be performed without
violation of such a provision, is illegal and void.").  <u>See</u>,
<u>Restatement (second) of Contracts</u> § 203(a) (2011) ("[A]n
interpretation which gives a reasonable, lawful, and effective
meaning to all the terms is preferred to an interpretation which
leaves a part unreasonable, unlawful, or of no effect.")

Thus, this Court declines to definitively rule on the proper
interpretation of the non-competition clause at this time.
Taking Counterclaim Plaintiffs' alleged facts as true and viewing

9

them in the light most favorable to them, this Court finds that Counterclaim Plaintiffs' assertion that Sterling's recommendation to City Trusts was an attempt to transfer assets out of the Revenue-Weighted Program in violation of the non-competition clause is plausible enough to survive this Motion to Dismiss.

Finally, Counterclaim Defendants' Motion to Dismiss Count VI in part against McElwee and Ireland is denied because it appears that they failed to accurately read Count VI and are seeking to dismiss something that Counterclaim Plaintiffs do not allege. Counterclaim Plaintiffs' allegation is not that McElwee and Ireland breached the Intentions and Assurances Agreement, nor do Counterclaim Plaintiffs seek to hold them personally liable for IL's alleged breach of that agreement.  Counterclaim Plaintiffs allege that McElwee and Ireland breached the Letter Agreement, to which Counterclaim Defendants do not dispute that they were parties; and is seeking to hold Sterling, IL, McElwee, and Ireland jointly and severally liable for breaching different agreements based upon the same conduct.  Thus, we shall likewise deny the Motion to Dismiss Count VI of the Counterclaim.

An order follows.